**UNITED STATES of America, Plaintiff,**

v.

**William A. KILPATRICK, Declan J. O'Donnell, John Pettingill, Sheila C. Lerner, Michael L. Alberga, C.S. Gill, C.M. Smith, Bank of Nova Scotia, Defendants.**

Crim. No. 82–CR–222.

United States District Court,
D. Colorado.

Sept. 24, 1984.

Charles Alexander, Trial Atty., U.S. Dept. of Justice, Tax Div., Washington, D.C., and Robert N. Miller, U.S. Atty., Linda S. Surbaugh, Asst. U.S. Atty., Denver, Colo., for U.S.A.

William C. Waller, Richard K. Rufner, Wagner & Waller, P.C., Englewood, Colo., for Kilpatrick.

James L. Treece, Littleton, Colo., for O'Donnell.

David L. Hiller, Duboskey & Hiller, Denver, Colo., for John Pettingill.

Thomas French, Dill, Dill & McAllister, Denver, Colo., for Lerner.

Donald E. Van Koughnet, Naples, Fla., for Alberga & Gill.

C.M. Smith, No Appearance.

James E. Nesland, Ireland, Stapleton & Pryor, Denver, Colo., and Robert J. Anello, Obermaier, Morvillo & Abramovitz, New York City, for Bank of Nova Scotia.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

KANE, District Judge.

### PROCEDURAL BACKGROUND

After a twenty month investigation conducted before two successive grand juries, the instant proceeding was commenced on September 30, 1982 by the filing of a twenty-seven count indictment charging seven individuals and The Bank of Nova Scotia with conspiracy, mail fraud and tax fraud and also charging William A. Kilpatrick with obstruction of justice (Count 27). The bank was charged in ten counts with conspiracy to defraud (18 U.S.C. § 371) (Count 1) and aiding and abetting a mail fraud (18 U.S.C. § 1341 and § 2) (Counts 13 through 21).

On February 21, 1983, I dismissed the first twenty-six counts of the indictment for failure to charge a crime and as improperly pleaded. Additionally, upon separate motion by the bank, I dismissed the charges in which the bank was named upon the ground that the indictment failed to allege that the bank or any of its representatives had the requisite knowledge and intent to commit the crimes charged. The government appealed the dismissals.

On August 8, 1983, after briefing but before oral argument, the Tenth Circuit entered an order partially remanding the case to me so that all defendants could participate in hearings to determine whether prosecutorial misconduct and irregularities in the grand jury process constituted additional grounds for dismissal.

Before and immediately after the partial remand by the Tenth Circuit, the Honorable Fred M. Winner, Senior United States District Judge, presided over post-trial motions hearings following a guilty verdict against Mr. Kilpatrick on Count 27. On August 25, 1983, at about the time of his retirement from the bench, Judge Winner issued a memorandum decision which, among other things, summarized the status of the hearings which were being reassigned to me. Further, Judge Winner ordered that the government provide defendants with copies of transcripts of all proceedings that occurred before the grand juries. After some bizarre episodes of procedural novelty, Judge Winner's opinion was finally published. *See United States v. Kilpatrick,* 575 F.Supp. 325 (1983). The instant Findings of Fact, Conclusions of Law and Order must be read in conjunction with Judge Winner's opinion.

The government attorneys failed to provide defendants with complete transcriptions as ordered. They apparently overlooked, and did not transcribe, dozens of

proceedings before the grand jury. The latter proceedings—which converted into hundreds of pages of transcript and, more significantly, disclosed clear violations of Rule 6—were not produced until the defense detected the lack of compliance with Judge Winner's order. Even now, the government remains unable to provide transcripts of all the proceedings and was unable to produce a single Rule 6(e) order (which government attorneys testified they obtained) authorizing several major disclosures of grand jury matters. The government asserts that it had turned over such transcripts as could be had as soon as they were received from the court reporter. Such, in my view, does not excuse the failure to produce complete and accurate transcripts. If the assertion minimizes the inference of dissimulation, it exacerbates stronger ones of confusion and indifference.

## FACTS ESTABLISHED BY THE RECORD [1]

### A. Grand Jury Agents

■ Despite detailed instructions from the impaneling court that the grand jury should maintain its independence and not develop into a "prosecutor's agent," shortly after both grand juries involved in the investigation leading to the instant indictment were sworn, the prosecutors created the office of "agent of the grand jury" for Messrs. Mendrop and Raybin, Special

Agents assigned by the IRS to assist the prosecutors.[2] Several months later an IRS agent assigned to the civil division and who the prosecutors relied upon as an expert was also sworn in as an "agent of the grand jury." G.J. Tr. Schneider, May 3, 1982, 1:34 p.m., at pp. 2–3. The prosecutors divined the office of "grand jury agent" by personally administering oaths before the grand jury to Raybin, Mendrop and Schneider.[3] The government concedes that the prosecutors possessed no authority to administer such oaths. Indeed, the prosecutor who administered the oaths now concedes he created the oath and was "shooting from the hip" when he did so. K.Tr. 501.

The government argues that this event should be viewed as a technical mislabeling of no great import. It is, however, more than a misnomer.

First, the prosecutor's description to the grand jury of the role of a "grand jury agent" clearly misled the grand jury as to the appropriate role of the IRS agents in the proceedings. *See* Winner opinion, 575 F.Supp. at 329. As conceded by the prosecutor, there is simply no basis for his description to the grand jury of the role of grand jury agents.[4] K.Tr. 501.

Second, the grand jury was consistently reminded of the agents' uniquely created and described role and urged to rely upon

1. The facts relied upon in this opinion are taken from voluminous transcripts of hearings before two grand juries, Judge Winner, and me and a trial before a jury. To aid the reader, the following citation form is used: references to the trial to the jury presided over by Judge Winner are cited as "T. Tr."; references to hearings on the motion for a new trial or acquittal and the motion to dismiss before Judge Winner are cited as "W. Tr."; and references to hearings on the motions underlying this order are cited as "K. Tr." Citation of the grand jury transcripts are captioned "G.J. Tr." and recite the relevant witness or declarant, the date and the time of the transcription. Defense and prosecution exhibits submitted on this matter are designated respectively "DX" and "PX."

2. The government seeks to absolve the prosecutors of any misconduct by pointing to instances where the prosecutors themselves informed the grand jury of its independent and unbiased mis-

sion. *See, e.g.,* G.J. Tr. Remarks of Prosecutor, July 8, 1981, 8:39 a.m. at pp. 9, 11; October 6, 1981, 10:58 a.m., at pp. 2, 3; September 29, 1982, 8:52 a.m., at p. 8. Such admonishments, however, are not curative of actions taken at other times which constitute abuses of the system and impinge upon the grand jury's integrity.

3. Agent Raybin testified that before Mr. Snyder gave him his oath as an agent of the grand jury, he was also sworn in by the foreman of the grand jury. K.Tr. 267.

4. Snyder did suggest that the swearing in of grand jury agents was practiced in Atlanta, Georgia and the Southern District of Florida. He did not, however, testify as to what grand jury agents did in these other districts or whether the practices employed elsewhere were similar to those used here. K.Tr. 414–15.

the IRS special agents as their "agents." Thus, on many occasions when Raybin and Mendrop appeared as witnesses the government attorney reiterated that they were appearing as "agents of the grand jury." [5] *See e.g.*, G.J. Tr. Mendrop, August 4, 1981, 9:25 a.m., at p. 2, August 5, 1981, 4:04 p.m., at p. 2, September 29, 1982, 9:32 a.m., at p. 2; G.J. Tr. Raybin, July 8, 1981, 9:11 a.m., at p. 5, March 3, 1982, 1:19 p.m., at p. 2, September 29, 1982, 2:32 p.m., at p. 2. Further, the government attorneys assigned special importance to identifying the IRS agents with the grand jury. When conducting interviews in connection with the investigation, Raybin and Mendrop were directed by the prosecutor to inform witnesses that they were "assisting a grand jury investigation in the Judicial District of Colorado." K.Tr. 619; *see also* G.J. Tr. Mendrop, August 5, 1981, 4:04 p.m., at p. 2; G.J. Tr. Raybin, July 8, 1981, 9:11 a.m., at p. 5, September 29, 1982, 2:32 p.m., at p. 2.[6]

Third, contrary to the role of the IRS agents described to the grand jury by the prosecutors, Mendrop and Raybin *did not* view their role and conduct their investigation as agents of an independent, unbiased grand jury. Rather, they viewed their role as agents of the Department of Justice, not the grand jury. When asked if his function as an agent of the grand jury was to assist the grand jury, Raybin testified:

A: My duties were designed to assist the Department of Justice in its investigation. . . .

K.Tr. 232.

Mendrop similarly interpreted his role as agent of the grand jury to be "primarily" to assist the prosecutors:

Q: . . . Mr. Mendrop, who were you really assisting in this matter during the grand jury investigation?

A: Well, *primarily, I was assisting the attorneys for the government* and indirectly I'm sure that I must have been assisting the grand jury through the work that I was doing for the investigation that they were, that they had under consideration.

Q: Well, in fact, you directly represented to the grand jury that you were assisting them, did you not, sir?

A: I'm not sure how you mean that.

Q: In fact, you represented to the grand jury that you were their agent and Mr. Snyder also represented to the grand jury that you were their agent; is that correct, sir?

A: I believe those words were used, yes, sir.

K.Tr. 401–02 (emphasis supplied).

Ironically, the government attorneys who created the grand jury agents and described their role are confused themselves as to whether the "agents" roles should be considered aligned with that of independent grand jurors or the prosecutors.[7] K.Tr. 534–35; 1126.

Fourth, the government attorneys used the "grand jury agents" to do more than assist the attorneys in the investigation. They used them to summarize evidence in front of the grand jury. On the first day that the second grand jury convened, after his pseudo-investiture as a grand jury agent, Raybin summarized the investigation so far conducted, explained tax shel-

---

5. On some occasions Mr. Snyder referred to Raybin and Mendrop as his agents. G.J. Tr. Remarks of Prosecutor, July 8, 1981, 8:39 a.m., at pp. 9, 15, 18, 21, 23; July 8, 1981, 12:05 p.m., at p. 5; August 5, 1981, 3:50 p.m., at p. 5; September 9, 1981, 8:37 a.m., at p. 2; September 9, 1981, 10:00 a.m., at p. 2; October 6, 1981, 10:58 a.m., at p. 12; May 3, 1982, 9:15 a.m., at p. 5. Such references did not, however, clarify the ambiguous role of the grand jury agents. As noted, the IRS agents were often referred to as agents of the grand jury. The confusion over the agents' role is discernible from isolated statements made by the prosecutors to the grand jury. Snyder, for example, said that he would, "have my agents, when I ask them to be sworn as agents of the Grand Jury, analyze [the documents] and basically figure out what they mean." G.J. Tr. Remarks of Prosecutor, July 8, 1981, 8:39 a.m., at p. 21; *see also* G.J. Tr. Remarks of Prosecutor, July 8, 1981, 12:05 p.m., at p. 5. The agents worked, in form, for the grand jury; but, in substance, they worked for the prosecution.

6. Mendrop and Raybin claim that they never introduced themselves to witnesses as agents of the grand jury. K.Tr. 243, 266–67, 366–67.

7. *See supra* note 5 and accompanying text.

ters to the jury, and opined that the circular financing utilized in the tax shelters under investigation was illegal. *See* G.J.Tr. Raybin, September 29, 1982, 2:32 p.m.; Mendrop, September 29, 1982, 9:32 a.m.; Raybin, September 30, 1982, 10:40 a.m. Similar kinds of substantive testimony were given by Raybin on September 9, 1981 and March 3, 1982. *See* G.J. Tr. Raybin, September 9, 1982, 10:02 a.m.; March 3, 1982, 1:19 p.m. On September 29 and 30, 1982, when the government attorneys, and apparently the "agents of the grand jury," were seeking the indictment, Raybin and Mendrop purported to summarize the evidence for the grand jury to support the 27 count indictment presented by the government attorneys. On September 30, 1982 Schneider appeared as "the expert" in the field of tax shelters to summarize the legal theory. G.J. Tr. Schneider, September 30, 1982, 9:22 a.m. These summaries contained numerous inaccuracies and were misleading in several respects. Although the government attorneys were quick to inform the grand jury of their role as advocates, the grand jurors were never informed that their "agents" were "primarily" representing the interests of the Department of Justice attorneys.

Finally, the prosecutors' creation and use of grand jury agents resulted in many other abuses and Rule 6 violations. Most notably the agents made many joint appearances before the grand jury, without the presence of government counsel, and read transcripts to the jurors. K.Tr. 483–87; 636–39; 691–92; 707–12.

Raybin and Mendrop appeared before the second grand jury to give testimony regarding the investigation. Each time they appeared alone, were sworn, and were examined by the government attorneys. When they appeared to read testimony from the first grand jury to the second grand jury, they appeared together, were apparently not sworn, and were not examined by government attorneys because the latter were usually absent. It is not clear in what capacity they were appearing to read testimony. The confusion was exacerbated by two other IRS agents—Burke and Shea—also appearing together to read testimony to the second grand jury. In what capacity they were appearing is even less evident since they were not made "grand jury agents" and the record of their appearance does not support a finding that they were witnesses.

The transcripts of the agents' simultaneous appearances establish that they were not present as witnesses. They appear not to have been sworn; they appeared together; they were not examined; and they were mostly unaccompanied by government attorneys. The testimony of the prosecutors and agents that the agents were sworn, even if evidenced by a transcript, would not authorize their simultaneous appearances under Rule 6(d). The recollection of the prosecutors and agents that the oath was administered is challenged by the almost dozen transcripts showing the oath was not administered on any single occasion where the agents appeared together.

The record reveals that the agents' many appearances before the second grand jury, whether sworn or unsworn, were largely unsupervised. The agents were frequently unattended by government attorneys and, in some instances, may have convened the grand jury sessions without government counsel in order to read testimony. K.Tr. 483–87; 636–39; 691–92; 707–12.

In other instances the transcripts do not make clear precisely when the agents entered or left the grand jury room. It appears that they may have been present while the prosecutors engaged in colloquy with grand jurors. G.J. Tr. Remarks of Prosecutor, February 2, 1982, 1:07 p.m. at p. 18; Remarks of Prosecutor, February 4, 1982, 3:30 p.m. at pp. 2–3; Remarks of Prosecutor, April 6, 1982, 9:08 a.m. at p. 8.

Both prosecutors acknowledge that the agents *"were not* under examination" when they read to the grand jury. K.Tr. 485 (emphasis supplied); *see also* K.Tr. 707. The conclusion that they were not under examination is inescapable because no attorney was present to conduct an examination. Further, the grand jurors were under

instructions *not* to question the agents during such appearances. K.Tr. 481–87.

## B. Improper Disclosure, Improper Use and Secrecy Violations

■ During the course of the grand jury investigation, the government representatives systematically disregarded the strictures of Rule 6(e). The record demonstrates that the responsibility and decision making authority that Rule 6(e) vests in government attorneys was relinquished to and exercised by the Internal Revenue Service. Members of that agency undertook a policy of determining whether and to whom disclosure of confidential material would be made and whether notification of such disclosure would be made pursuant to the Federal Rules. Moreover, the evidence suggests that information was disclosed to other IRS agents for use in civil cases. Grand jury secrecy was repeatedly breached by those with a duty to remain silent and secrecy obligations were imposed upon others of whom the law does not require confidentiality.

### (1) Disclosure

The disclosure notices filed pursuant to Rule 6(e)(3)(B) indicate that numerous individuals at all levels of the Internal Revenue Service, many of whom were assigned from the civil division of that agency, were permitted access to grand jury material. DX Q; *see* K.Tr. 26, 29–36, 40, 43, 50. The hearings have demonstrated that numerous other IRS personnel (all of whom were civil personnel), were given access to grand jury material, that these people were never identified on a disclosure notice and that they remain unknown even now.

That the decision as to which individuals should be privy to the grand jury material was frequently made by the IRS, rather than by the prosecutors, was admitted by the agents.[8] K.Tr. 241. That it was the norm is confirmed by several additional facts. Disclosure was made liberally and often before obtaining attorney approval, an act the prosecutors acknowledged vio-

lates Department of Justice rules. K.Tr. 57–69; 754. Notice of such disclosure was not made "promptly" as required by Rule 6(e). The decision as to which names to include on the disclosure lists was largely left up to the IRS agents. The integrity of the lists themselves, as well as the decisions to make disclosure to the listed personnel, is lacking. The government attorneys admitted that they were unable to identify a substantial number of those named on the disclosure notices. K.Tr. 498–99. Further, these notices were frequently filed by attorneys having little relationship to the investigation. *See* K.Tr. 15–67; DX Q. The IRS agents were likewise unable to identify many of the persons on the list or why they were listed. K.Tr. 14–22, 30, 36–38, 39, 43–44, 56, 60–61, 65, 69, 106–09.

Perhaps the best illustration of the insouciance with which grand jury disclosures were made and recorded appears in the circumstances surrounding the post-indictment notice. The agents were directed by the government attorneys to pick their brains and prepare a catch-all disclosure notice listing any individuals whom they could recall may have had access to secret grand jury materials but who were not listed as required. Thus, on October 20, 1982, approximately three weeks after the indictment was returned, a final notice of disclosure adding sixteen names of IRS employees was filed. K.Tr. 57–59.

The agents' post hoc attempt to determine to whom disclosure had been made in order to supplement the disclosure notices was not entirely successful. Numerous persons with access to grand jury material were forgotten and never included on the notices. The discovery of these forgotten people occurred only because, during the hearings, government representatives testified at length concerning two computer programs compiled from grand jury documents, ostensibly for purposes of assisting in the grand jury's investigation. *See, e.g.,* K.Tr. 71–79, 87–91, 157–61. The perform-

---

8. The government claims that all prosecutorial decisions made by IRS agents were done in consultation with the prosecuting attorneys. K.Tr. 145–46.

ance of this function was riddled with Rule 6(e) violations.

Although the prosecutors testified that a court order was obtained permitting the transfer of the derivative grand jury information for that purpose to Lowry Air Force Base, the government was unable to produce such an order at the hearings. K.Tr. 494–9; 517; 755; 807. The prosecutors acknowledge that no order was obtained permitting transfer of similar information to Dallas and Utah, a failure caused by their unawareness even at the hearing that the IRS agents had taken it upon themselves to arrange for the computer work to be done at those locations and because the prosecutors left the "details" of the computer work to the IRS. K.Tr. 87–88, 494–96, 523, 807.

Many IRS employees with access to information used in compiling the computer program were eventually listed on the disclosure notices. *See* K.Tr. 34, 40, 43, 61, 72, 76, 78. Just as many, however, apparently never found their way onto the lists. Although the computer programs were created by computer "groups" in Dallas and Ogden (K.Tr. 74–76), the Disclosure Notices list few, if any, of the computer personnel from Utah or Texas. The indifference of the government attorneys is further revealed by the fact that a student clerk assisting the prosecutors was not listed as having had access to grand jury material although it was revealed at these hearings that she did. K.Tr. 1085–87.

Whatever instructions there were, if any, concerning disclosure and use of the grand jury material was apparently passed on by the staff of the Internal Revenue Service itself and not by the Department of Justice attorneys. Little or no instruction concerning the strictures of Rule 6(e) is included in the training of many of those IRS employees who had access to the information. K.Tr. 155.

Further, when the IRS agents acting as "agents of the grand jury" undertook the task of explaining the secrecy provisions to other employees of the IRS, it is clear that the information was of little practical use. For example, one such agent testified that, although he informed the supervisor of the computer program that he should disclose information only to one whose name was listed on the disclosure notices, only a few of the names on those lists were revealed to the supervisor. K.Tr. 155.

### (2) Improper Use

The free rein given the IRS by the Department of Justice attorneys in this investigation and in the use and disclosure of grand jury material presents a serious possibility that the extraordinary powers of the grand jury were manipulated in order to obtain evidence useful in later civil litigation. The record reveals that such a danger was real and that substantial investigative activities disclosures were made for purposes other than "to assist an attorney for the government in the performance of [his] duty to enforce federal criminal law." *See* Rule 6(e)(3), Fed.R.Crim.P.

■ IRS institutional intent to take advantage of the grand jury investigation in civil audits was confirmed by Richard Gullion, a civil IRS agent assigned to the examination division in Denver, who freely acknowledged that the IRS hoped to take advantage of the facts developed by the criminal investigation after conclusion of the criminal proceedings. W.Tr. 836–38. The government, in resisting this claim, has asserted that no improper disclosure to IRS civil agents has occurred. K.Tr. 150–51, 413–14, 416–17, 645–46. Disclosure is only one of the forbidden purposes. It is equally improper to manipulate the grand jury investigation to obtain evidence for eventual civil use by the IRS. *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983). As is discussed below, the record confirms that the grand jury's extraordinary powers and resources were, in part, initiated and channeled for just such a purpose.[9]

---

**9.** The occasional self-serving statements by prosecutors to the grand jury that use of grand jury information in IRS audits is improper does not absolve the improper disclosures but merely serves to highlight the seriousness of the misconduct. G.J. Tr. Remarks of Prosecutor, July 8, 1981, 8:30 a.m., at pp. 12–13; November 4, 1981, 9:12 a.m., at p. 6.

The government's investigation of defendants originated at the IRS in 1979. From August, 1979 to July, 1980, the IRS conducted a joint civil and criminal investigation. In July, 1980, the IRS referred its investigation to the Tax Division of the Department of Justice with the recommendation that a grand jury investigation be conducted because its administrative processes were potentially ineffective. DX M.

The agents' testimony that they abandoned all civil interest when the grand jury commenced reminds me of Joel Chandler Harris' story about Bre'r Rabbit asking the fox not to throw him in the briar patch. At least one witness believed that the government was anxious to build civil cases through the use of grand jury information. W.Tr. 73–74. Several facts confirm that the IRS agents did not abandon entirely IRS civil interest in recouping taxes.

For example, agents of the IRS interviewed numerous tax shelter investors. The interviewees were threatened that if they did not speak voluntarily a grand jury subpoena might be obtained. Thus, they were informed that the interview was being conducted in lieu of a grand jury appearance. K.Tr. 191. In connection with these investor interviews the IRS agents assisted in the creation of "Investor Questionnaires." These questionnaires instructed interviewers to ask numerous questions concerning the tax shelters. Several of the questions involved investor motives, a subject of no conceivable relevance to a criminal investigation of the targets but highly relevant in a civil audit of the investor. DX W; G.J. Tr. Raybin, January 6, 1981 at pp. 4–7. That this interviewing program had no criminal investigation purpose is demonstrated by the fact that no investor, let alone any investors interviewed, appeared before the grand jury. None of the interviews, nor the results of the interviews, was presented to the grand jury. K. Tr. 149. The government offered no explanation at the hearings of why and for what purpose such interviews were conducted.

Civil IRS employees, armed with grand jury information, were brought into the investigation to prepare audits of the tax shelter investors. These audits, like the interviews, were not presented to the grand jury and no reasons or explanations for their preparation were offered at the hearings. K. Tr. 149.

IRS activity since the return of the indictment confirms its intent to utilize the grand jury investigation and information for civil litigation purposes. Since return of the indictment the IRS has issued civil audit letters to the investors interviewed, notifying them that their returns were being examined. The letters read in part: "[a] report will be issued in the near future containing a position consistent with *facts* as presented in the Federal Grand Jury Indictment of September 30, 1982, for the United States District Court for the District of Colorado." DX L (emphasis supplied); *see also* K. Tr. 176–78, 344–48.

Finally, several statements attributed to the prosecutors by witnesses during the course of the investigation confirm that the grand jury proceedings, at least in part, were conducted for other than legitimate federal criminal purposes. Richard Birchall, a former attorney with the Department of Justice, testified that "[t]here was a vengeance to the manner in which [the prosecutor] conducted the investigation." W.Tr. 69. Mr. Birchall also reported that on one occasion the prosecutor indicated that even if he were unsuccessful on the merits, the defense would be excessively expensive to the defendants. W. Tr. 133.

A similar improper motive was testified to by Donald Morrison a witness who made numerous grand jury appearances. With regard to a proposed business activity of some of the defendants, Morrison testified that a prosecutor indicated they were going to "shoot in [the] ass [the] coal deal." W. Tr. 192. These statements were vigorously denied by the prosecutors. I am in no position to resolve the obvious conflict in the testimony by assessing the credibility of witnesses appearing before Judge Winner with those appearing before me. Thus, I do not find as a fact that the statements were actually made. I describe them here because they illustrate the infusion of hostility and vitriol which permeates this en-

tire case—a condition which I attribute to the frequently rude, consistently arrogant, and occasionally obnoxious conduct of some of the government attorneys assigned to the prosecution of this case.[10]

### (3) Secrecy Violations

■ Several instances demonstrate blatant disregard for the time-honored tradition of grand jury secrecy. As discussed below, such violations were utilized by the government, not only to gain what was certainly perceived as an advantage in connection with the intended prosecution but were also apparently part of an improper attempt to embarass the targets and hinder the ongoing operation of their business during the course of the grand jury investigation.

Throughout the course of the grand jury investigation the government widely publicized the names of the individuals and entities that were being investigated as well as the nature of the grand jury's inquiry. The dissemination of information concerning the proceedings before the grand jury was undertaken without the circumspection normally afforded such disclosure by government attorneys. Such disclosures were particularly egregious insofar as the recipients of the information were known customers and business associates of the targets.

With the knowledge of Department of Justice attorneys, numerous letters were sent out identifying the targets, the related entities and the nature of the criminal investigation. The letters were sent to individuals beyond the subpoena power of the grand jury and with whom it was understood the targets had ongoing business and professional relationships. The letters, which were written on the letterhead of the United States Attorney, but signed by supposed agents of the grand jury, were not only misleading in terms of the capacity in which they were sent, but also clearly posed a danger of adversely affecting the acknowledged business and professional re-

lationships. K. Tr. 121–25, 597–98, 969–75; DX V–1 through V–15; DX Y.

The text of the letters read in part as follows:

The *United States Department of Justice is conducting a Grand Jury investigation of the business activities of William A. Kilpatrick, Declan J. O'Donnell, John Pettingill and Sheila C. Lerner* for the years 1977 through 1980. The Grand Jury is attempting to determine whether these individuals, through United Financial Operations, Inc., P & J Coal Company, Inc., Marlborough Investments, Ltd., International Fuel Development Corp., Ltd., and International Block Construction Company, Ltd., have committed violations of Title 18 and Title 26 of the United States Code.

*The Grand Jury has obtained information which indicates that you have had and/or currently do have a business relationship with one or more of the individuals and/or entities listed above.* It has been determined that your testimony will be helpful in resolving questions which still face the Grand Jury. Subsequently, the United States Department of Justice cordially invites you to appear and testify before the Federal Grand Jury in Denver, Colorado (U.S.A.) at your convenience. Transportation, lodging and meals will be arranged for and paid by the United States Department of Justice.

\* \* \* \* \* \*

We look forward to your response,
Sincerely yours,
STEPHEN L. SNYDER
Trial Attorney
Criminal Section
Tax Division
By: PAUL E. RAYBIN
<u>Special Agent</u>

(emphasis supplied)

The impropriety of publicly identifying targets in these letters was readily apparent to Judge Winner:

---

10. For examples, see sections of this opinion entitled "Facts Established by the Record," F.

and G.

[T]he identity of the persons and the transactions which were under grand jury scrutiny shouldn't be disclosed to anyone by letter or otherwise, but these startling letters ·did precisely that.

575 F.Supp. at 334.

The prejudicial disclosure of the targets and the nature of the grand jury's investigation, however, was not limited to these "startling letters." During the course of the investigation, the "agents of the grand jury," and other employees of the IRS, ostensibly in connection with the ongoing criminal investigation, interviewed numerous investors in the tax shelters. Those investors, too, were informed of the nature of the grand jury's inquiry and the names of those being investigated. K. Tr. 93–94.

Rule 6(e) imposes upon government attorneys the obligation to secure grand jury information from improper disclosures. That obligation was breached several times. The disclosure of secret grand jury material was not limited to identification of the targets of the investigation. Grand jury information was also shared with Richard Birchall a witness and one-time potential target.[11] Details of the investigation were revealed to Birchall during a meeting in which one of the prosecutors attempted to persuade him to assist in the government's investigation by suggesting that the grand jury had received evidence warranting his consideration as a target. W.Tr. 44–52, 983–84; 575 F.Supp. at 332–33.

Moreover, Birchall, who apparently was led to believe that he might face criminal exposure, was left unattended in a room housing grand jury material. He admittedly utilized the opportunity to rummage through the grand jury documents. 575 F.Supp. at 332–33. In further disregard of the secrecy provisions of Rule 6(e) another witness, Bernard Bailor noted that the room in which the grand jury material was housed was generally left open. W. Tr. 1130–31. Judge Winner commented that he found Mr. Bailor's testimony to be

knowledgeable and candid during the hearings. 575 F.Supp. at 338–43.

Whatever may be said as to the impropriety of Richard Birchall's rummaging through grand jury testimony and documents when he was left alone in the grand jury storage room, it does not excuse the government attorneys' impropriety in availing him of that opportunity. Before leaving him alone in the grand jury storage room they accused Birchall of making several extortion threats to O'Donnell, a target of the investigation. K.Tr. 377, 381, 422–23, 425–26. Birchall obviously took advantage of the opportunity improperly provided to him to search through the grand jury records and documents.

### (4) Improper Imposition of Secrecy Obligations

■ For what the record reveals was clearly an improper strategic purpose, secrecy obligations in clear violation of Rule 6(e)(2), Fed.R.Crim.P., were imposed upon two grand jury witnesses. On January 5, 1982, David H. Hoff and David R. Major appeared before the grand jury. When Hoff appeared separately before the grand jury he was advised:

Q: You are also aware that the proceedings of this Grand Jury are secret and that is covered by Rule 6 of the Federal Rules of Criminal Procedure, that is, any questions I put to you today, questions that the Grand Jury may have, any discussion we have in this room at your appearance, that your appearance should be kept secret by you; do you understand that?

A: Yes, sir, I do.

G.J.Tr. Hoff, January 5, 1982, 9:59 a.m., at p. 4. A similar directive was given to David R. Major, G.J.Tr. Major, January 5, 1982, 11:13 a.m., at p. 5.

These confessed violations of Rule 6(e) were neither innocent nor inadvertent. Rather, the record reveals the improper obligation to keep the information and fact

---

**11.** Both government attorney Snyder and agent Mendrop dispute Birchall's testimony. K.Tr. 423–36; 376–89.

of their appearances secret was imposed for a strategic purpose.

Both witnesses occupied positions as attorneys who had formerly represented Defendants Kilpatrick and O'Donnell in previous SEC proceedings involving the same tax shelters under investigation before the grand jury. *See* G.J.Tr. Remarks of Prosecutor, January 5, 1982, 9:09 a.m., at p. 8. The government attorney explained to the grand jury the purpose of calling them as follows:

> The primary focus of our investigation involving the financing is the factual representations made concerning Marlborough Investments Limited, IFDC; we want to know what the lawyers were told by the principals, and what information they relayed to the parties.

G.J.Tr. Remarks of Prosecutor, January 5, 1982, 9:09 a.m., at p. 12. Thus, the government attorney imposed the unauthorized secrecy obligations upon these two witnesses to prevent defendants from determining the nature and extent of any such communication that might have been revealed and to foreclose a challenge to such testimony based upon an applicable privilege.

Such a conclusion is buttressed by the fact that the same government attorney examined four other witnesses that same day, several witnesses two days later on January 7, 1982, and approximately fifteen witnesses on other occasions. *None* of those witnesses were given the same directive. The prosecutors were fully cognizant that Rule 6(e) prohibits the imposition of secrecy obligations on grand jury witnesses.[12]

Indeed, during these hearings, the Department of Justice attorney involved acknowledged that at the time he imposed the improper obligations he was aware of the United States Attorneys' Manual provisions prohibiting the imposition of an obligation of secrecy upon a witness. Yet, although provided with ample opportunity, he was

unable to offer any legitimate reason for his transgressions. K.Tr. 697–99.

### C. Use of Pocket Immunity

During this investigation, Department of Justice attorneys ignored entirely the federal immunity statute (18 U.S.C. §§ 6001, *et seq.*) which prescribes the congressionally authorized procedure for conferring grants of immunity and, instead, secured testimony by engaging extensively in what I have previously described as the "damnable practice" of bestowing "informal immunity" through "letters of assurance." *United States v. Anderson*, 577 F.Supp. 223, 233 [13] (D.Colo.1983). The testimony of 23 witnesses in this investigation was secured by means of such "immunity" conferred by Snyder and Blondin. K.Tr. 513. Not one witness was given statutory immunity.

The profligate issuance of such "letters of assurance" had its inception shortly after the investigation commenced, in a telephone call between one of the prosecutors and Bernard Bailor, Esq., who, with his firm, represented many of the witnesses who later received such letters. K.Tr. 476. Bailor explained that his clients would not testify voluntarily before the grand jury. In response, the prosecutor suggested that in lieu of statutory immunity he would be willing to issue letters of assurance. Mr. Bailor accepted the offer and at that point a procedure for issuing the so-called informal "immunity" was inaugurated. K.Tr. 476–77.

After reaching his agreement with Bailor, the prosecutor apparently consulted with senior assistant chief Edward Vellines of the Tax Division. According to the prosecutor, Vellines indicated that the prosecutor had the authority to issue such letters of assurance provided he abided by the instructions of a Department of Justice memorandum *and* the United States Attorneys Manual *and* provided further that the

---

**12.** *See supra* note 20.

**13.** As discussed later, *see supra* text accompanying note 21, I now believe I was unduly diffi-

dent in *Anderson.* The practice is not merely damnable; I believe now that it is clearly illegal.

recipient was not a target of the investigation. K.Tr. 514–15; 602; 623.

Thereafter, the prosecutors undertook, without seeking specific approval from any superior, what was characterized as a "liberal" policy of distributing this type of informal immunity to witnesses. At no point was an effort made to obtain statutory immunity for any witness, nor was the United States Attorney's Office for the District of Colorado informed of the issuance of such letters though written on United States Attorney's stationery. K.Tr. 476–77, 720, 731–32; 575 F.Supp. 335–36; Remarks of Prosecutor, February 2, 1982 at 1:07 p.m. at p. 5–8; DX U–1–U–17.

No witness who testified pursuant to this form of informal "immunity" bestowed by the prosecutors indicated that he or she would have been less cooperative or unwilling to testify had he or she been granted statutory immunity. Rather, the government attorneys readily concede that they chose the method they did simply for the sake of expediency—to by-pass the review procedure established by Congress in the statutory scheme. K.Tr. 476, 721–22; 724–28. Among the vehicles for review avoided by the unauthorized method chosen here was the statistical compilation that Congress indicated as among its purposes for establishing the statutory procedure. Indeed, the government acknowledged that, unlike grants of statutory immunity on which central records are maintained, there is no realistic way for the Department of Justice to determine the number of letters of assurance executed. K.Tr. 729; 839. Despite what the prosecutor explains were his specific instructions, informal immunity was bestowed upon individuals once considered targets of the investigation (*i.e.*, John Jewell and Richard Bell). Moreover,

one of the prosecutors admitted having conferred immunity upon an individual who it was later learned had failed to file tax returns for several years. K.Tr. 734–35; *see also* G.J.Tr. Kitrick, May 5, 1981, 10:36 a.m., at p. 3–4; Stephenson, April 6, 1981, 3:01 p.m., at p. 3–4, 575 F.Supp. at 335.

In their deliberate efforts to avoid the review process and the certainty that Congress intended in the granting of witness immunity, the prosecutors injected serious ambiguity in the critical area of witness credibility. Several facts demonstrate the seriousness of the ambiguity created by this unauthorized procedure.

Despite alleged explanations of letters of assurance,[14] the grand jurors whose job it was in this investigation to assess witness credibility were presented with conflicting descriptions of the effect of these letters upon the witnesses and, consequently upon the value to place upon their testimony. On some occasions, the witnesses were advised before the grand jury that the letters gave them "immunity" and that they had no Fifth Amendment privilege. *See, e.g.*, G.J.Tr. Stanley, April 6, 1981, 4:27 p.m., at p. 5; Stephenson, April 6, 1981, 3:01 p.m., at p. 4; Kitrick, May 5, 1981, 10:36 a.m., at p. 4; Miller, June 2, 1981, 9:28 a.m., at pp. 3–4. On other occasions, witnesses were advised that although they were testifying after receiving a letter of assurance, they retained their Fifth Amendment privilege and could refuse to testify. *See, e.g.*, G.J.Tr. Jewell, February 4, 1982, 1:19 p.m., at pp. 2–3; Caddell, February 4, 1982, 10:50 a.m., at p. 3; Folsom, April 6, 1982, 11:42 a.m., at p. 4; *see also*, G.J.Tr. Remarks of Prosecutor, February 2, 1982, 1:07 p.m. at pp. 5–8.

---

**14.** The government's brief, Government's Response to the Bank of Nova Scotia's Proposed Findings of Fact and Conclusions of Law, filed April 9, 1984, at p. 19 provides:

On February 2, 1982, Mr. Snyder advised the grand jury of his negotiations with Mr. Bailor [attorney for many of the witnesses], and again explained to the grand jury the difference between statutory immunity and letters of assurance. 2/2/82 (1:07 p.m.) G.J. Colloquy 5–14.

The transcript for G.J. Tr. February 2, 1982, 1:07 p.m. presents the testimony of Gordon MacManus. The substance of the testimony consists entirely of an inquiry as to whether Mr. MacManus's attorney was being paid for by Realty Inc. and whether Mr. MacManus would invoke his right against self incrimination. Contrary to the government's assertion, the transcript reflects the prosecutor's attempts to prejudice the grand jury. *See supra* text accompanying note 15.

Moreover, the prosecutors' avoidance of statutory immunity in this investigation left every witness in the posture of testifying with the impression and fear that unless the witness' testimony pleased the government, the government might withdraw its assurances. That such a fear was more real than imagined was apparent to Judge Winner in his review of the events surrounding the grand jury appearance of Richard Bell, a witness who testified with a "Letter of Assurance."

> Mr. Bell was represented by his brother, Malcolm, an attorney practicing in New York City, and a witness I found to be straight-forward, fair, convincing, and most generous to Mr. Snyder. Malcolm Bell succumbed to the carrot of pocket immunity for his brother, but, later he was told by Mr. Snyder that if Richard 'testified for Mr. Kilpatrick, all bets were off.' Maybe this meant that if Mr. Bell perjured himself he would be prosecuted for perjury, but if the immunity statute had been followed, the nagging question of the meaning of 'all bets are off' wouldn't confront us.

575 F.Supp. at 335.

The meaning of the admonition of the prosecutor was a "nagging question" to Malcolm Bell, who as an experienced attorney ultimately determined that the prosecutor must have meant that the deal was not withdrawn but that Richard Bell was subject to perjury. More significantly, however, Richard Bell, as would most lay witnesses, believed it meant the "Letter" would be withdrawn. T.Tr. 460–63.

### D. Witness Invocation of Privilege Against Self-Incrimination

The prosecutors pursued their course of distributing letters of assurance "quite liberally" until, in the words of one of them, it was decided "all good things come to an end." G.J.Tr. Remarks of Prosecutor, February 2, 1982, 1:07 p.m. at p. 5. At that point they replaced the unauthorized procedure with the equally abusive and dubious practice of calling witnesses who had not been issued letters and having them invoke their Fifth Amendment privilege before the grand jury regarding the targets and the transactions under investigation; knowing in advance that they would do so. K.Tr. 515.

In all, seven witnesses were called to invoke their privilege in February and March, 1982. That the purpose was to prejudice the grand jury against the targets and the tax shelter transactions under investigation, and not to lay a statutory predicate for immunizing the witnesses (which the prosecutor never did) cannot be denied. First, the prosecutor who called the witnesses admitted that he did not do so to obtain congressionally authorized grants of immunity. K.Tr. 515. Second, the uniform questions posed to the witnesses evidence the intention to utilize the witnesses assertion to prejudice the grand jurors against the targets:

> Q: Now, Mr. Drizin, if I would ask you any questions concerning any relationship you may or may not have had with William A. Kilpatrick, John Peddingill [sic], Shiela Lerner or Declan J. O'Donnell or United Financial Operations, would you assert your right against self-incrimination on those questions?
>
> A: Yes, sir.

G.J.Tr. Drizin, March 2, 1982, 9:29 a.m., at p. 4. Third, the prosecutor did not limit his questioning merely to have the witness invoke his Fifth Amendment privilege but rather questioned several of the witnesses to elicit that Kilpatrick's company, United Financial Operations, was paying their attorneys' fees, leaving the grand jury with the impression that their refusal to testify was being financed by the targets.[15] See e.g., G.J.Tr. D'Amico, February 4, 1982, 12:35 p.m., at pp. 6–7.

■ That the prosecutor's conduct in this regard (which occurred before the second of the two grand juries empanelled in connection with this investigation) was known to him to be improper and prejudicial is revealed by his statements to the first grand jury several months earlier:

**15.** See supra note 14.

Immediately all the witnesses I had subpoenaed today decided that they would not want to come in here and testify and they said they would assert their Fifth Amendment rights.

I could force them in here under their Fifth Amendment rights, but under the Department of Justice guidelines *I should not do that except in exceptional circumstances should I bring a person in here and have them assert their Fifth Amendment rights because it serves no purpose and it only serves to prejudice, and it can prejudice a layman.*

G.J.Tr. Remarks of Prosecutor, February 2, 1981, 9:40 a.m. at pp. 2–3 (emphasis supplied). Indeed, the prosecutor did to the second grand jury precisely what he told the first grand jury he could not and should not do. The only difference is that, when he did it anyway, he did not tell the grand jurors that he was doing it to them. General instructions, months prior, that jurors not draw inferences from an individual's invocation of the privilege against self incrimination cannot correct such corruptions of the grand jury process. G.J.Tr. Remarks of Prosecutor, July 8, 1981, 10:50 a.m., at p. 6; January 5, 1982, 9:09 a.m., at pp. 22–23.

### E. Government Summaries of the Evidence

Although the investigation of the instant case covered almost two years, the transcripts reveal that the case against The Bank of Nova Scotia was, for the most part, presented on a single day, September 29, 1982, the day before the indictment was returned. It was done, moreover, almost exclusively by having Mendrop summarize the "evidence" against the bank. The government seeks to explain these summaries as nothing more than legitimate use of hearsay testimony by the grand jury. *See United States v. Rogers*, 652 F.2d 972, 975 (1981).

During the course of the September 29, 1982 proceedings, the grand jurors expressed concern that The Bank of Nova Scotia was being singled out for prosecution while other banks that allegedly permitted similar banking activity were not being named as defendants. In response, the prosecutor suggested that the Bank of Nova Scotia was a more appropriate target because, unlike the other institutions involved, it was a large internationally known bank doing business in the United States and its prosecution could be expected to deter others. *See* G.J.Tr. Mendrop, September 29, 1982, 9:32 a.m., at p. 50–52. The prosecutor erroneously suggested that the "evidence" indicated that The Bank of Nova Scotia representatives were familiar with the operation of Kilpatrick's business and that the IRS was to be defrauded by virtue of the banking activity. *See* G.J.Tr. Remarks of Prosecutor, September 29, 1982, 8:52 a.m. at pp. 8, 13.

No evidence of the kind suggested by the prosecutor had been presented to the grand jury. The discussion of these points was heard for the first time during the testimony of Mendrop. Instead of being presented as a witness who was to present hearsay investigative information concerning the Bank's role, Mendrop was introduced to the grand jurors as one who was to "summarize" and "just walk through, one more time, and refresh your memory." G.J.Tr. Remarks of Prosecutor, September 29, 1982, 8:52 a.m. at p. 5. Mendrop then proceeded to "summarize the evidence relating to each of the individuals involved" and "the evidence pertaining to The Bank of Nova Scotia." *See* G.J.Tr. Mendrop, September 29, 1982, 9:32 a.m., at pp. 40, 52, 64, 66, 72. On the vital issue of the bank's knowledge and intent, however, it is clear that Mendrop's testimony was both misleading and inaccurate. In particular, Mendrop purported to "summarize" in connection with the bank's role the testimony presented by three witnesses: Messrs. Waters, Ros and Charles. An examination of the grand jury testimony, however, reveals that it was not a summary of the evidence before the grand jury. One of the witnesses whose testimony was "summarized" never appeared before either grand jury. The other two witnesses whose testimony was "summarized" did not give testimony even remotely resembling that supposedly

"summarized" by Mendrop. The grand jury was never informed of these mischaracterizations or of any alternative basis for Mendrop's summary.

The inaccurate "summaries" of the evidence before the grand jury concerning the role of The Bank of Nova Scotia was particularly abusive for several reasons:

(i) The misleading "summaries were presented by an individual upon whom the grand jurors had been urged to rely as their "agent,"

(ii) The investigation spanned 20 months and two successive grand juries. Much of the testimony of the 27 witnesses who appeared before the first jury was read to the second grand jury in an improper and unsupervised manner,

(iii) The grand jurors had not previously focused on The Bank of Nova Scotia as a target since the bank was not mentioned as a target until the month the indictment was returned;

(iv) The reading of testimony from the first grand jury (which included the testimony of Ros and Charles) occurred early in the presentation of the case to the second grand jury. The grand jurors and the prosecutors frequently commented upon the monotony and difficulty of listening to the readings and, indeed, the grand jurors expressed confusion as to which transcripts had been read. *See, e.g.,* G.J.Tr. Remarks of Prosecutor, November 4, 1981, 9:12 a.m. at p. 5; Remarks of Prosecutor, February 2, 1982, 1:07 p.m. at p. 20; and

(v) The improper summaries related to vital issues concerning the Bank's knowledge and intent. Unbeknown to the grand jurors, the government attorneys contemporaneously entertained serious doubts as to the accuracy of certain critical "facts" contained in the summaries.

In sum, the mischaracterizations reasonably could not have been expected to be picked up by the grand jurors and, undoubtedly, formed a substantial basis for the indictment against the bank. The ex-

amples of improper mischaracterizations of the evidence are detailed below.

### (1) Mr. Waters

Asserting that he was discussing a "few of the pieces of evidence" and "the summary of the evidence pertaining to The Bank of Nova Scotia," Mendrop purported to summarize what the prosecutor characterized as the "evidence" provided by Waters about a trip supposedly made by defendant Monte Smith, the bank's Cayman Island branch manager, to Kilpatrick's offices in Denver. (Smith was vital as it is upon his activities that the bank has been claimed vicariously liable.) G.J.Tr. Mendrop, September 29, 1982, 9:32 a.m., at pp. 36, 64, 65–72; *see also* G.J.Tr. Remarks of Prosecutor, September 29, 1982, 9:07 a.m., at p. 10. According to Mendrop and the prosecutor, this claimed trip by Monte Smith was important because it demonstrated that Smith was familiar with Kilpatrick's tax shelter operations. Apparently unbeknown to the grand jurors, Waters never testified before either of the grand juries. The grand juries were never informed of the actual source of Mendrop's testimony which apparently was an interview of Waters or testimony of Waters at a contempt hearing involving Kilpatrick.

Whatever the source, it is clear that Mendrop's supposed "summary" of Waters' testimony is an inaccurate recitation of "facts" in several significant respects. At the time Mendrop was supposedly summarizing the "facts" of Monte Smith's trip to Denver, the government attorneys entertained serious doubts about its accuracy because Waters' description of the individual he met at Mr. Kilpatrick's offices did not resemble Monte Smith.[16] The testimony of Waters during the 1983 obstruction trial of Mr. Kilpatrick confirms the inaccuracies of Mendrop's testimony. During that trial Waters testified that when picking up some checks from Kilpatrick for payment due him, he was informed by Kilpatrick that

---

**16.** The government claims that the doubts about the accuracy of Water's description did not arise until after Mendrop testified. Nevertheless, even under the government's version, such doubts existed months before the indictment. K.Tr. 1067–68.

one of the people present was Mr. Smith who was the manager of the Bank branch on which the checks were drawn. Mr. Waters' description of that individual during trial does *not* resemble Monte Smith. T.Tr. 311–12. In fact, at these hearings, commenting on Mr. Water's somewhat unusual description of Monte Smith, one of the prosecutors admitted that at the time "[t]here was a real question as to whether or not it was the same person." K.Tr. 742–43. Despite the facts that Waters was not called as a witness before either grand jury, that the grand jurors were never informed that transcripts of taped interviews of Waters existed and that a "real question" existed as to the accuracy of Waters' identification, Mendrop was permitted to represent to the contrary that there was "considerable confirmation that Mr. Smith did actually come out here and visit with Mr. Kilpatrick." G.J.Tr. Mendrop, September 29, 1982, 9:32 a.m., at pp. 66–68.

### (2) Mr. Ros

Raul Ros, a "chauffeur" for Mr. Kilpatrick, testified before the first grand jury. He did not appear before the grand jury that returned the indictment; his testimony was read to the second grand jury. G.J.Tr. Mendrop, September 9, 1981, 8:44 a.m., at p. 3. A year after Mendrop read his testimony to the grand jurors, Mendrop purported to summarize it. According to Mendrop, Ros' evidence confirms the testimony of Waters with regard to Monte Smith's appearance in Denver. G.J.Tr. Mendrop, September 29, 1982, 9:32 a.m., at p. 66. Mendrop indicated that Ros commented that during Smith's claimed visit to Denver, he and Kilpatrick discussed funding for the tax shelters. No such testimony can be found in Raul Ros' grand jury transcript. Mendrop gave absolutely no explanation of an alternative source, but rather erroneously led the grand jurors to believe that he was simply relaying information contained in the Ros testimony before the prior grand jury.

### (3) Mr. Charles

Mendrop's "summary" also mischaracterizes the testimony of Barry Charles.

Like Raul Ros, Charles testified before the first grand jury not the second grand jury. As he did with Raul Ros' testimony, Mendrop attributed "testimony" to Charles that the bank fulfilled virtually all of Mr. Kilpatrick's requests and that it "appeared" to Charles that the bank officers knew what was being done. G.J.Tr. Mendrop, September 29, 1982, 9:32 a.m., at p. 68. The "summary" given by Mendrop is at odds with Charles' testimony. G.J.Tr. Charles, June 2, 1981, 8:40 a.m. Again, Mendrop did not identify any alternate source for the comments attributed to Charles.

In his testimony before the first grand jury Charles indicated that he was not present during most of the transactions in the bank. Charles, who traveled to the Cayman Islands with Kilpatrick, Pettingill and O'Donnell, was the least involved in the group and observed less than Oliver Hemphill who himself testified that he had witnessed little of the banking activity. *See* G.J.Tr. Hemphill, May 5, 1981, 9:28 a.m., at p. 12. Thus, Mendrop's suggestion to the grand jurors of the "evidence" to be gleaned from Charles "testimony" is contradicted by the actual testimony of Charles and others.

### (4) Comments by the Prosecutor

In addition to presenting Mendrop's summary of the "important evidence" against the bank on the day before the indictment, the prosecutors also argued in favor of an indictment of the bank. Once again, the evidence against the bank on the essential issue of knowledge of the claimed object of the conspiracy was seriously mischaracterized by the prosecutor, who asserted:

[A]s my agents will tell you there is evidence that the Bank knew it was the IRS—*they were in fact told that it was the IRS they were defrauding.*

G.J.Tr. Remarks of Prosecutor, September 29, 1982, 8:52 a.m. at p. 13 (emphasis supplied). No such evidence was ever presented. Indeed, even the misleading summary of Mendrop provides no basis for such a statement.

### F. Interrogation in Absence of Counsel

In February, 1983, during the period between indictment and dismissal of the charges against The Bank of Nova Scotia, one of the prosecutors departed from the traditional role of a government trial attorney in order to travel to Puerto Rico and engage in investigative activity. The prosecutor undertook his journey with the intention of interviewing bank employees concerning the whereabouts and reasons for transfer of another bank employee, Malcolm Haynes, who the prosecutor understood was the second in command at the bank's Cayman Island branch during the period covered by the indictment. No attempt had been made to talk to this potential witness before indictment. The prosecutor's purpose was to interview him concerning matters underlying the indictment. W.Tr. 642–49; 694; 709–10.

Although the prosecutor was fully aware that the bank, an indicted defendant, was represented by counsel, he did not feel constrained by the Supreme Court's dictates in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) to inform counsel of his intentions to interview high ranking bank employees.[17] Instead, he undertook this investigative exercise with the "hope" of eventually interviewing Malcolm Haynes "in the absence of Mr. Morvillo,"[18] firm in the belief that, if he committed a constitutional violation of the type identified in *Massiah*, the only likely sanction was the suppression of evidence in the government's case-in-chief. In the prosecutor's words, "no indictment has ever been dismissed because of [a *Massiah* violation]." K.Tr. 1114, 1122; W.Tr. 643, 693–94, 709–10.

The prosecutor also testified that he believed it was permissible to interview high ranking employees of an indicted corporate defendant because it was authorized in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) and because, unlike *Massiah* he was not engaged in acts of "subterfuge."[19] W.Tr. 643, 693–94, 709–10; K.Tr. 1114–15.

When he arrived in Puerto Rico, the prosecutor and another investigator, Victor Torrez Perez, an IRS special agent, appeared without prior arrangement at the branch offices of The Bank of Nova Scotia and proceeded to interrogate several of its representatives. Among others, they questioned Malcolm Haynes' former secretary and his replacement, the branch's controller. They also interrogated other high ranking representatives of the bank—including Douglas Rector, the Puerto Rico area manager of The Bank of Nova Scotia and chief executive officer of the Bank's Puerto Rico subsidiary. W.Tr. 640–42, 696–99.

After leaving the bank, accompanied by Special Agent Torrez Perez, he searched out the school attended by Haynes' two small daughters, ages eight and ten, in order to determine the whereabouts of their parents. At the end of the school day, the prosecutor (who had already elicited information from the school's principal and the girls' teachers) followed the children on foot "by about a hundred yards." His purpose was to have the girls lead him to their mother. W.Tr. 642–45; 699–708.

The prosecutor's visit to Puerto Rico, however, did not end his endeavor to interrogate high ranking representatives of the defendant bank without notice to or leave of defense counsel. Shortly after his interrogation of Mrs. Haynes, he wrote a letter to her requesting that she use her efforts to have her husband speak with the government. Like his previous efforts this

---

17. The government argues that interviewing Haynes does not give rise to *Massiah* violations because he was only "a potential witness who had information as to the bank's conduct concerning the events charged in the indictment." Government's Response to The Bank of Nova Scotia's Proposed Findings of Fact and Conclusions of Law, filed April 9, 1984, at p. 37. The government ignores *Massiah* because Haynes was not individually named as a defendant in the indictment. *Id.* Nevertheless, the government does recognize that Haynes "was the number two man in the Cayman Island branch of The Bank of Nova Scotia at the time of the events in question." *Id.* quoting W.Tr. 653.

18. Mr. Morvillo is the bank's lead defense counsel.

19. *See supra* note 23.

approach was made without informing defense counsel. Indeed, the prosecutor asserted that he "would have interviewed Mr. Haynes in the absence of Mr. Morvillo hopefully." W.Tr. 709–10.

### G. Mistreatment of Witnesses

Professor Roland Hjorth, a tax law professor who Judge Winner observed "is a recognized expert who was employed by defense counsel" was permitted to testify before the grand jury that returned the indictment. His treatment by the prosecutor on the occasion of his appearance contrasts markedly with the treatment the prosecution afforded its own expert, Roger Schneider, who was passed off as an "agent of the grand jury."

As Judge Winner observed:

[Professor Hjorth's] views of tax law differed markedly from those of [the prosecutor], who bragged on frequent occasions that he had never taken a course in taxation and knew almost nothing about it. Nevertheless, Professor Hjorth was browbeaten and ridiculed by [the prosecutor], and some of the conversation so out of place for an ethical prosecutor took place during a recess in the hearing of some grand jurors.

575 F.Supp. at 333.

Indeed, the prosecutor's heated argument with Professor Hjorth was also overheard by witnesses scheduled to appear before the grand jury. W.Tr. 334. Moreover, the conduct was so shocking that Richard Slivka, a local attorney formerly employed by the Department of Justice and Colorado United States Attorney's Office, who was representing witnesses scheduled to appear and who himself observed the conduct, wrote a letter to Chief Judge Finesilver shortly thereafter reporting the incident. W.Tr. 317–27; 350–64. Professor Hjorth testified that the prosecutor's conduct was so abusive that he would never again appear as an expert witness in a similar proceeding.

Judge Winner concluded of the prosecutor's conduct that:

Intimidating witnesses by telling them that their testimony disgraces them and

implying that the Tax Division of the Department of Justice will take after the witness and will complain to the University of Washington Law School because an expert testified to his expert opinions does no credit to our government.... [s]eemingly, the professor's testimony isn't seriously contested. I hope that we haven't gotten to the point that disagreement with the legal concepts of the IRS provides grounds for attacks by that bureaucracy because sometimes the IRS is wrong. *U.S. v. Sells Engineering*, 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 and *U.S. v. Baggot*, 463 U.S. 476, 103 S.Ct. 3164, 77 L.Ed.2d 785.

575 F.Supp. at 333; *see also* K.Tr. 502–05.

### CONCLUSIONS OF LAW

The government's position in this case is reminiscent of the common law defense of confession and avoidance in which, for the most part, the truth of the averments of fact are admitted, but argument is made which tends to deprive the facts of their ordinary legal effect or obviates them. Thus, it is said:

Just as there has never been a perfect lawyer, a perfect judge, or perfect trial, so has there never been a perfect investigation. Contrary to what one might expect, in view of the defense allegations, the transcripts of the grand jury proceedings do not reveal any conduct whatsoever by the prosecutors seeking to overreach or override the independence of the grand jury.

Government Memorandum, Government Response to The Bank of Nova Scotia's proposed Findings of Fact and Conclusions of Law, filed April 9, 1984, at pp. 3–4. The government's response to the defendants' several proposed findings of facts is mainly a recitation of the number of instances in which its prosecutors did not violate the law.

As I view the present state of the law as it applies to this case, there are four analytical modalities which must be considered. In the first, specific violations of specific rules require dismissal. I view this form

of analysis as essentially quantitative. There either is a violation or there isn't and the conclusion is ineluctable depending on the factual premise which is established. The second modality, requires an evaluation of the totality of circumstances extant so that a qualitative assessment may be made. Finally, cases distinguish the third modality, the authority and duty of district courts to supervise the conduct of prosecutions and grand juries, from the fourth modality, the duty to enforce the mandates of the Constitution.

In articulating the conclusions of law I have reached in this case, I shall consider all four modalities in the order in which I have just expressed them. I shall begin with Rule 6, Fed.R.Crim.P.

### A. Violations of Rule 6(d)

■ As noted by Judge Winner, Rule 6, Fed.R.Crim.P. does not authorize grand juries to have agents. The creation of that role and its misleading description to the grand jury is an improper intrusion into the exclusive and independent province of the grand jury by government attorneys and investigators. The most important function of the grand jury is to stand between the government agents and the suspect as an unbiased evaluator of the evidence. *United States v. Dionisio*, 410 U.S. 1, 16–17, 93 S.Ct. 764, 772–773, 35 L.Ed.2d 67 (1973). "The purpose of the grand jury requires that it remain free, within constitutional and statutory limits, to operate 'independently of either prosecuting attorney or judge." *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 103 S.Ct. 3133, 3141, 77 L.Ed.2d 743 (1983).

■ Rule 6(d), Fed.R.Crim.P., delimits those who may be present in grand jury proceedings by the following explicit language:

(d) Who May Be Present. Attorneys for the government, the witness under examination, interpreters when needed and, for the purpose of taking the evidence, a stenographer or operator of a recording device may be present while the grand jury is in session, but no person other than the jurors may be present while the grand jury is deliberating or voting.

After his usual thorough analysis of the relevant case law and with characteristic pungency, Judge Matsch, of our Court, stated in *United States v. Pignatiello:*

A review of all of these cases reinforces the conclusion that the only effective sanction for a violation of Rule 6(d) is dismissal without any further inquiry into the effects of that violation.

582 F.Supp. 251, 254 (D.Colo.1984).

I conclude that events which occurred in the grand jury room while *soi-disant* agents of the grand jury were present and not under oath as witnesses under examination violated Rule 6(d) and therefore require dismissal of the indictment. As Judge Matsch carefully notes in *Pignatiello*, brief intrusions on the proceedings during which no testimony is taken nor questions asked nor statements made about the case by grand jurors such as the delivering of a note to the prosecutor by his secretary or the repair of a switch by a maintenance man are not included within the *per se* rule. In this case, there is no doubt that matters of considerable substance occurred while Rule 6(d) was being violated.

### B. Violations of Rule 6(e)

■ Courts have held that violations of the strictures of Rule 6(e), Fed.R.Crim.P., typically require the sanction of contempt rather than dismissal. *United States v. Hoffa*, 349 F.2d 20, 43 (6th Cir.1965). However, where Rule 6(e) is violated recklessly and systematically, dismissal is appropriate. *United States v. Gold*, 470 F.Supp. 1336, 1352–56 (N.D.Ill.1979). Where knowing violations of Rule 6(e) prejudice and embarrass targets whose identities the government reveals, the government itself has recognized that the contempt remedy is *"not always ... wholly adequate."* United States Attorneys' Manual § 9–11.370 (emphasis supplied).

(1) *Rule 6(e)(3)—Improper Disclosure and Use*

■ Rule 6(e)(3) provides in relevant part:

(3) Exceptions.

(A) *Disclosure otherwise prohibited* by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand jury, *may be made to—*

(i) an attorney for the government for use in the performance of such attorney's duty; and

(ii) *such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law.*

(B) Any person to whom matters are disclosed under subparagraph (A)(ii) of this paragraph shall not utilize that grand jury material for any purpose other than assisting the attorney for the government in the performance of such attorney's duty to enforce federal criminal law. *An attorney for the government shall promptly provide the district court, before which was impaneled the grand jury whose material has been so disclosed, with the names of the persons to whom such disclosure has been made.*

(emphasis supplied).

The prosecutors in this case permitted several violations of this rule. They relinquished to the IRS their responsibility to determine the persons to whom disclosure would be made. The IRS agents then failed to provide the "prompt" notification of such disclosure mandated by the rule. Moreover, the IRS representatives, in direct contravention of recent Supreme Court dictates, improperly manipulated the secret material and their novel roles as "agents of the grand jury" to obtain information and data for use during civil litigation that they knew would follow on the heels of the criminal case. *See United States v. Sells Engineering, Inc., supra, United States v.*

*Baggot,* 463 U.S. 476, 103 S.Ct. 3164, 77 L.Ed.2d 785 (1983).

Rule 6(e)(3) provides that disclosure can be made to "such government personnel as are deemed necessary by an attorney for the government ..." provided the "attorney for the government ... promptly provide[s] the district court ..." with notice of such disclosure. The instant record reveals not only that IRS representatives regularly took it upon themselves to determine to whom disclosure should be made, but also that in some cases the "attorneys for the government" were not notified of such disclosure until after it had occurred, if they were notified at all. Moreover, notices to the district court were not filed promptly but were prepared in some instances substantially after such disclosure, even after the investigation had concluded and the indictment was filed.

With regard to the delegation of the Rule 6(e)(3) responsibilities in this investigation by Department of Justice attorneys, Judge Winner noted:

I am troubled about testimony suggesting that authority to make the disclosure decisions was delegated to the IRS Special Agent/Grand Jury Agents/Prosecutor's helpers. Under common law rules of agency, this authority couldn't be delegated to a subagent, and especially it couldn't be delegated to an IRS agent whose fellow workers were aiming at the defendants from a different angle. My worry on this score is not lessened by an IRS letter in evidence saying that making a civil tax case under the administrative process would be difficult. *United States v. Sells Engineering* and *United States v. Baggot,* both *supra,* which settle the question of using a grand jury to collect taxes.

575 F.Supp. at 338 (1983).

The broad delegation to the IRS of control over the course of the grand jury investigation is amply supported by the record. The extensive disclosure of grand jury material to IRS civil employees, the haphazard and *post hoc* method of identifying those to whom disclosure was made

and the omission from the disclosure notices of numerous IRS employees privy to grand jury information clearly contravene the rule. It is fanciful to suggest that these IRS and civil employees will erase from their minds that material obtained as part of the grand jury's investigation.

In *United States v. Sells Engineering, Inc., supra,* the Supreme Court recognized that it is difficult or impossible to demonstrate the extent of improper disclosure and use of grand jury material made during the course of an investigation. *Id.* 103 S.Ct. at 3142. In the instant case a significant portion of the direction of the investigation was unrelated to the federal criminal goals. As the Supreme Court observed:

> [B]ecause the Government takes an active part in the activities of the grand jury, disclosure to government attorneys for civil use poses a significant threat to the integrity of the grand jury itself. If prosecutors in a given case knew that their colleagues would be free to use the materials generated by the grand jury for a civil case, they might be tempted to manipulate the grand jury's powerful investigative tools to root out additional evidence useful in the civil suit....

*Id.*

In *Sells* the Supreme Court analyzed the grand jury process and the provisions of Rule 6(e) in deciding whether civil division lawyers in the Department of Justice should have automatic access to grand jury materials to assist them in civil litigation. The court denied such access for three reasons: (1) civil disclosure threatens to subvert the limitations otherwise imposed on the government's powers in civil and administrative discovery and investigation; (2) civil disclosure may tempt prosecutors to manipulate the grand jury investigation to obtain evidence useful in civil litigations; and (3) civil disclosure increases the number of persons privy to grand jury matters thereby increasing the risk of inadvertent or illegal disclosure to others. *Id.* at 3142, 43. The IRS's participation in the grand jury investigation in this case achieved each of these illicit purposes.

As noted by Judge Winner, the genesis of the grand jury's inquiry was a belief by the IRS that it could not effectively investigate the facts underlying the subject tax shelters pursuant to its congressionally circumscribed administrative enforcement powers. Thus, the extraordinary powers of the grand jury were sought and usurped.

(2) *Rule 6(e)(2)—Secrecy Violations*

Rule 6(e)(2), Fed.R.Crim.P. provides:

> (2) General Rule Of Secrecy.—A Grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court.

Rule 6(e)(2) is a codification of the traditional requirement that matters occurring before the grand jury should be treated as confidential. Courts have consistently recognized that this traditional requirement exists to no small degree in order to protect the name and reputation of the targets during the pendency of the period the allegations are being investigated. *See e.g. United States v. Malatesta,* 583 F.2d 748, 752 (5th Cir.1978), *cert. denied,* 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979). Thus, courts have held that Rule 6(e) prohibits the government from publicly identifying the targets of a grand jury's inquiry. *See In re Bart,* 304 F.2d 631, 637 n. 19 (D.C.Cir.1962); *Hawthorne v. Director of Internal Revenue,* 406 F.Supp. 1098, 1128–29 (E.D.Pa.1975).

During the course of this investigation the government repeatedly and systematically disclosed the identity of the targets to individuals and entities that the government acknowledged had a "business relationship" with the targets and to investors identified as customers of the targets.

These numerous disclosures adversely affected the business activities of the targets at a time when the grand jury was charged with investigating whether any crimes may have been committed. The abuse of power is evident.

The violations of Rule 6(e)(2) do not end with the improper violations of the secrecy requirements. In order to gain a tactical advantage, prosecutors selected two witnesses and directed them not to disclose the fact or substance of their testimony. As Judge Winner held, this was done in direct contravention of Rule 6(e)(2):

> [The imposition upon witnesses of secrecy obligations] is now verboten because of the language of the rule saying, 'No obligation of secrecy may be imposed on any person except in accordance with this rule.' This language has been uniformly interpreted to prohibit any instruction to a witness that his testimony is secret. *In re Langswager*, (1975) D.C. Ill. 392 F.Supp. 783; *In re Grand Jury Witness Subpoenas* (1974) D.C.Fla. 370 F.Supp. 1282; *In re Alvarez* (1972) D.C. Cal. 351 F.Supp. 1089; *In re Minkoff* (1972) D.C.R.I. 349 F.Supp. 154; *In re Investigation before April 1975 Grand Jury* (1976) D.C.Cir. 531 F.2d 600; *In re Vescovo Special Grand Jury* (1979) 473 F.Supp. 1335, and many other cases. In spite of this express command of Rule 6(e), secrecy obligations were imposed on several witnesses, and, to make the violation more disturbing, secrecy obligations were imposed on lawyers called to furnish information concerning their clients. That makes the violation gravely beyond the pale, because of the impossible position the lawyer-witness is placed in, but that's what the grand jury transcript discloses. No 'oath' of secrecy was administered, but an obligation of secrecy was imposed by instructions from government counsel to witnesses. This foolish-

ness may or may not have been intentional, but ignorance of the law is not a defense available to a prosecutor. *This misconduct is established by the record, and it will prove difficult for the government to deny,* just as the government had to admit the attempted administration of an 'oath' by Mr. Snyder. The government suprisingly defends the proven mishmash of functions of the IRS Special Agent/Grand Jury Agents/Assistants to the Attorney for the Government appointed under Rule 6(e), but maybe it thinks that admitting that this was error would confess the motion to dismiss.

575 F.Supp. at 331, 332 (1983); *see also United States v. Radetsky*, 535 F.2d 556, 569 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); *Application of Eisenberg*, 654 F.2d 1107, 1113 n. 9 (5th Cir.1981); *In re Russo*, 53 F.R.D. 564, 570 (C.D.Ca.1971); *In Re Disclosure of Evidence*, 184 F.Supp. 38, 41 (E.D.Va.1960); *Arlington Glass Co. v. Pittsburgh Plate Glass Co.*, 24 F.R.D. 50, 52 (N.D.Ill.1959).

As Judge Winner suggests, the only issue that could not be determined by the record before him was whether the secrecy obligations were imposed intentionally. The prosecutor's testimony during the hearings before me, however, leaves no doubt that the improper obligation was imposed deliberately, with full knowledge of the witness's relationship to the targets and in violation of the commands of the United States Attorneys' Manual.[20] Moreover, no legitimate explanation for the activity was ever presented.

The numerous violations of Rule 6(e) by the Department of Justice attorneys ignore the rights of unindicted subjects of an investigation and the secrecy and independence of the grand jury itself. As I shall discuss later, a court's supervisory power

---

**20.** The United States Attorneys' Manual provides at § 9–11.362:

> Rule 6(e) specifically prohibits any obligation of secrecy from being imposed 'upon any person except in accordance with this rule.' Witnesses, therefore, cannot be put under any obligation of secrecy. *Application of Eisen-*

*berg,* 654 F.2d 1107, 1113 n. 9 (5th Cir.1981). This, however, should not prevent the grand jury foreman from requesting a witness not to make unnecessary disclosures when those disclosures or the attendant publicity might hinder an investigation.

to dismiss an indictment is appropriately utilized to ensure that governmental impropriety of a similar nature is not repeated in future investigations or prosecutions. *United States v. Owen*, 580 F.2d 365, 367 (9th Cir.1978); *United States v. Houghton*, 554 F.2d 1219, 1224 (1st Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977). Dismissal is particularly appropriate in order to hold all government prosecutors acting within this district to the same high standard of conduct that the United States Attorney demands of his own assistants. *United States v. Jacobs*, 547 F.2d 772, 778 (2d Cir.1976) (Organized Crime Strike Force attorney operating in the Eastern District of New York); *United States v. Gold*, 470 F.Supp. 1336 (N.D.Ill. 1979) (Environmental Protection Agency Staff attorney appointed as Special Attorney in the Department of Justice); *see also United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir.1972).

As previously indicated, however, I hold that where violations of Rule 6(e) are intentional or reckless and systemic, the sanction of contempt is insufficient and dismissal of the indictment is warranted. Under such circumstances, it is not necessary for the defendant to show that he has been prejudiced by the violations. In the instant case, however, such showing of prejudice has been convincingly made.

### C. Violations of Witness Immunity Statutes

Earlier in this opinion,[21] I indicated that I believe I was unduly diffident in describing so-called pocket immunity or "Letters of Assurance" as a "damnable practice." I believe I was wrong because I did not then have the benefit of the Supreme Court's opinion in *United States v. Doe*, —— U.S. ——, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984).

In *Anderson v. United States, supra*, I wrote:

The government, in this case, made extensive use of informal or 'pocket' immunity. This is putative immunity granted to a witness by letter or oral representation of the prosecutor rather than ordered by a judge after satisfaction of the procedures of 18 U.S.C. §§ 6002 and 6003. Such immunity poses serious problems since it circumvents the statute and leaves an inadequate record of the scope of the immunity granted. *See, United States v. Quatermain, Drax*, 613 F.2d 38 (3rd Cir.1980). The procedures established by Congress in 18 U.S.C. §§ 6002 and 6003 clearly indicate an intent to formalize, standardize and limit the use of immunity. The statute requires approval of a senior Justice Department official as well as application to and order of a United States District Court Judge before immunity is conferred. The procedure leaves no doubt as to the accomplishment of the grant, the particularized need of the witness and the scope of the immunization. It also leaves for Congress and the public a complete and definite record of the frequency, efficacy and reasons for the use of immunity. Informal immunity, apparently in widespread use by the Justice Department, accomplishes none of those goals. It is a damnable practice. No notice need be given to senior Justice Department officials or to a judge. The only record, if any, is a letter by the U.S. Attorney or a transcript of an oral representation, if it was made on the record. Such informality has resulted in confusion over witnesses rights in the past, *Quatermain, Drax, supra*, 613 F.2d 38, and lends itself to excessive use of unchecked discretion. While the immunity grant is always a matter of prosecutorial discretion, the procedures of §§ 6002 and 6003 subject it to the light of public, congressional and judicial scrutiny and insure that it is not invoked or revoked arbitrarily or capriciously.

In *United States v. Doe*, Justice Powell wrote:

As we stated in *Pillsbury Co. v. Conboy*, 459 U.S. 248, 74 L.Ed.2d 430, 103 S.Ct. 608 (1983), in passing the use immunity statute, 'Congress gave certain officials in the Department of Justice exclusive authority to grant immunities.' *Id.*, at

---

**21.** *See supra* note 13.

253, 74 L.Ed.2d 430, 103 S.Ct. 608 [at 612]. 'Congress foresaw the courts as playing only a minor role in the immunizing process: ...' *Id.*, at 254, n. 11, 74 L.Ed.2d 430, 103 S.Ct. 608 [at 613]. The decision to seek use immunity necessarily involves a balancing of the Government's interest in obtaining information against the risk that immunity will frustrate the Government's attempts to prosecute the subject of the investigation. *See United States v. Mandujano,* 425 U.S. 564, 575, 48 L.Ed.2d 212, 96 S.Ct. 1768 [1776] (1976) (plurality opinion). Congress expressly left this decision exclusively to the Justice Department. If, on remand, the appropriate official concludes that it is desirable to compel respondent to produce his business records, the statutory procedure for requesting use immunity will be available.

— U.S. at ——, 104 S.Ct. at 1244–45, 79 L.Ed.2d at 562–63.

■ It thus can be seen most clearly that Congress has vested exclusive authority to grant immunities in a few specified officials in the Department of Justice. Further, Congress has clearly and unequivocally set forth the parameters within which that discretion must be exercised. Ordinary statutory construction employing the principle of *expressio unius est exclusio alterius* and buttressed by the quoted language of Justice Powell leads to only one conclusion: Pocket immunity is illegal; when granting immunity, the Department of Justice must comply with the requirements of 18 U.S.C. §§ 6002 and 6003.

■ I hold that the repeated use of letters of assurance or so called "pocket immunity" in the instant case violated the applicable statutes and tainted the grand jury indictment with its illegality.[22]

### D. Violations of the Fifth Amendment

■ Courts have consistently held that it is improper to call a witness solely for purposes of having that witness assert their rights under the Fifth Amendment when the prosecutor is aware of the witnesses' intention to do so. *See Namet v. United States,* 373 U.S. 179, 186, 83 S.Ct. 1151, 1154, 10 L.Ed.2d 278 (1963); *United States v. Ritz,* 548 F.2d 510, 521 (5th Cir. 1977); *United States v. Maloney,* 262 F.2d 535, 537–38 (2d Cir.1959). The facts here demonstrated that the prosecutor hoped to take advantage of impermissible inferences that arise from invocation of the privilege. *See United States v. Maloney,* 262 F.2d 535 (2d Cir.1959). The prosecutor's ploy "served no other purpose than calculated prejudice." *United States v. Samango,* 607 F.2d 877, 883 (9th Cir.1979).

■ Moreover, the improper efforts to prejudice the defendants by impermissible inferences flowing from the seven witnesses' assertions of their privilege against self-incrimination was compounded by the questioning concerning the payment of the witnesses' legal fees. No legitimate purpose for such questioning exists. Indeed, similar questioning before a grand jury has been held to be improper. *United States v. Gold,* 470 F.Supp. 1336, 1352 (N.D.Ill.1979).

Dismissal of an indictment is not required *per se* by the deliberate contriving of a prosecutor to have witnesses invoke their Fifth Amendment privilege. Such conduct is, however, a factor to be considered in the totality of circumstances in determining whether a grand jury has been overreached or usurped.

### E. Presentation of Misinformation

■ The mischaracterization of the testimony before the grand jury and the unidentified use of questionable hearsay information with regard to vital issues intrudes upon the independent role of the grand jury. *See United States v. Samango,* 607 F.2d 877 (9th Cir.1979). The court

---

**22.** The conventional remedy for illegal use of "pocket immunity" would, in most instances, take the form of a *post facto* grant of statutory immunity or the equitable enforcement of the pocket agreement, for the benefit of grand jury witnesses who relied on the prosecutor's promises. These concerns are not before me here. Still, the use of pocket immunity was so pervasive in this case that it reflects upon the general conduct of the prosecutors and the grand jury.

in *Samango* emphasized that such behavior, even if unintentional, causes "improper influence and usurpation of the grand jury's role." *United States v. Samango,* 607 F.2d at 882. Such a danger is particularly present where, as here, the misrepresentations could not be expected to be readily apparent to the second grand jury and related to material issues in the prosecution. *See id.* at 883; *United States v. Lawson,* 502 F.Supp. 158 (D.Md.1980) (indictment dismissed where prosecutor's examination of witness created a false impression and misled grand jurors as to nature of the evidence); *United States v. Gallo,* 394 F.Supp. 310 (D.Conn.1975) (indictment dismissed where grand jurors misled as to hearsay nature of testimony and misstatements).

### F. Violations of the Sixth Amendment

█ It is beyond cavil that, upon indictment, a defendant becomes an "accused" with a right to counsel guaranteed by the Sixth Amendment. *See Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The guarantees of the Sixth Amendment apply to corporate defendants with the same force as to individual defendants. *United States v. Rad-O-Lite of Philadelphia, Inc.,* 612 F.2d 740, 743 (3d Cir.1979); *see also Grandbouche v. Adams,* 529 F.Supp. 545, 547 (D.Colo.1982). In order to give meaning to these guarantees, the Supreme Court has held that once a defendant becomes an accused, it is improper for a government official to question that defendant out of the presence of counsel. *Brewer v. Williams, supra; Massiah v. United States, supra.*

█ In the instant case, the Department of Justice engaged in precisely the type of interrogation proscribed by the Supreme Court.[23] Without notifying counsel for the indicted bank, the prosecutor along with a federal agent, impermissibly interrogated several high level bank employees in hopes of obtaining incriminating information. In several respects the instant conduct is even more egregious than that which occurred in *Brewer* and *Massiah.* The prosecutor's actions here were premeditated and prompted by the expectation that the worst that would become of his constitutional violations would be a limited suppression of evidence.[24]

**23.** The prosecutor's *post hoc* rationalizations attempting to demonstrate the propriety of his conduct do the opposite. *See supra* text accompanying note 18. *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) establishes that corporate employees of the kind interrogated here fall within the ambit of the attorney-client relationship and must be considered, in essence, the corporation for purposes of communications. Indeed, while the Supreme Court in *Upjohn* noted that instead of procuring interview notes of the corporation's attorneys, counsel for the government might themselves question employees about relevant events, the facts of that decision give no indication that questioning would be proper if conducted behind counsel's back. Rather, the opinion indicated that questioning would occur with appropriate procedural safeguards. Moreover, *Upjohn* was not a criminal case and the corporation had not been indicted. Thus, *Massiah* and its progeny, of course, were inapplicable. Indeed, the facts and relevance of *Upjohn* are so inapposite as to raise questions as to the sincerity of its invocation.

The prosecutor also relied upon *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596 (8th Cir.1977) as support for its position. That case too dealt with civil litigation and the question of attorney client privilege with a corporate client. The case did not concern post-indictment activity by prosecutors.

The prosecutor's second *post hoc* rationalization that *Massiah* did not restrict his interrogation because he did not employ subterfuge requires little discussion. The Supreme Court did not base its holding in *Massiah* upon the use of subterfuge. Rather, that opinion was premised on an accused's right to counsel. Thus, in *Brewer v. Williams,* the Supreme Court specifically noted that the fact that "the incriminating statements were elicited surreptitiously in the *Massiah* case, and otherwise here, is constitutionally irrelevant." *Brewer v. Williams,* 430 U.S. at 400, 97 S.Ct. at 1240.

**24.** Unlike the situations in *Brewer* and *Massiah,* the interrogation of the bank's representatives was conducted not by an investigatory agent, but primarily by an attorney involved in the prosecution also calling into question a possible violation of that attorney's ethical obligations.

Disciplinary Rule 7–104 of the Code of Professional Responsibility provides in relevant part:

*Communicating With One of Adverse Interest.*

(A) During the course of his representation of a client a lawyer shall not:

The defendants have not, however, demonstrated any prejudice from the interrogations of bank employees in the absence of counsel. The bank's counsel has performed ably and adequately throughout the litigation. Under such circumstances, the Supreme Court has specifically rejected the remedy of dismissal based upon a prosecutor's violation of a defendant's Sixth Amendment rights. "[A]bsent demonstrable prejudice or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981). *See also United States v. Drake*, 655 F.2d 1025, 1027 (10th Cir.1981); *United States v. Kapnison*, 743 F.2d 1450 at 1454 (10th Cir.1984). As in *Morrison*, so it is here:

> [Defendant] has demonstrated no prejudice of any kind, either transitory or permanent, to the ability of [its] counsel to provide adequate representation in these criminal proceedings. There is no effect of a constitutional dimension which needs to be purged to make certain that [defendant] has been effectively represented....

449 U.S. at 366, 101 S.Ct. at 669. Accordingly dismissal of the indictment is an inappropriate remedy for the *Massiah* violations in this case.[25]

The Sixth Amendment abuses were, in some instances, undertaken by the prosecutors appearing before the grand jury. Thus, while not directly implicating actions by the grand jury, such actions do reflect upon the general abuses of the grand jury process practiced by the government. The *Massiah* violations must enter into my general qualitative assessments of the prosecutors' and grand jury's conduct.

### G. The Totality of Circumstances Test

 As I stated in *United States v. Anderson*, 577 F.Supp. 223, 230 (1983):

> The Tenth Circuit Court of Appeals has recently articulated the standard to be applied in cases where dismissal of an indictment is sought because of prosecutorial misconduct:
>
> > An indictment may be dismissed for prosecutorial misconduct which is flagrant to the point that there is some significant infringement on the grand jury's ability to exercise independent judgment.
>
> *United States v. Pino*, 708 F.2d 523, 530 (10th Cir.1983). While the remedy of dismissal is extraordinary, it may be used 'to insure proper standards of conduct by the prosecution.' 708 F.2d at 530. District courts are also empowered to dismiss indictments because of inherent supervisory powers which protect the

---

> (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

See *United States v. Thomas*, 474 F.2d 110, 111–12 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973). *Cf. Ceramco, Inc. v. Lee Pharmaceuticals*, 510 F.2d 268 (2d Cir. 1975).

**25.** The prosecutor's interrogation and surveillance here is precisely the type of deliberate governmental impropriety that should be discouraged. *See United States v. Owen*, 580 F.2d 365, 367 (9th Cir.1978), *citing Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *United States v. Houghton*, 554 F.2d 1219, 1224 (1st Cir.1977), *cert. denied* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120. Insofar as the prosecutor by his own admission was not

deterred by the possibility of other available remedies, dismissal remains the only viable prophylactic tool. The Supreme Court has gone to great lengths to explain that the good faith efforts of law enforcement officials should not be overcome by technicalities beyond their control. *See United States v. Leon,* ── U.S. ──, 104 S.Ct. 3430, 82 L.Ed.2d 677 (1984). The apposing proposition requires that effective sanctions be imposed to prevent deliberate constitutional violations by law enforcement officials. Constitutional protections are of little value if violations are permitted without the imposition of meaningful sanctions. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961); *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960). Here, the prosecutor's premeditated interrogation of bank employees behind the back of the bank's counsel plainly violated the Sixth Amendment protections outlined by the Supreme Court in *Massiah* and *Brewer*.

integrity of the judicial system. 708 F.2d at 531. Isolated errors and improprieties do not require dismissal of the indictment. It is only when the government engages in deliberate conduct which interferes with the grand jury's independent function or damages the integrity of the judicial process that the remedy of dismissal becomes necessary. Because I find that the government engaged in a pattern of conduct calculated to infringe the grand jury's ability to exercise independent judgment, the indictments must be dismissed.

\* \* \* \* \* \*

The grand jury is more than a symbol of the limitations the constitution places on the government's power. When the government usurps the grand jury and destroys its independence so that it looks and acts like an arm of the prosecution, the very essence of a government of limited powers is destroyed. *See, United States v. Dionisio,* 410 U.S. 1, 17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973); *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

In *United States v. Samango,* the Ninth Circuit said:

The Court's power to dismiss an indictment on the ground of prosecutorial misconduct is frequently discussed but rarely invoked. Courts are rightly reluctant to encroach on the constitutionality-based independence of the prosecutor and grand jury.[26] The Court 'will not interfere with the Attorney General's prosecutorial discretion unless it is abused to such an extent as to be arbitrary and capricious and violative of due process.' *United States v. Welch,* 572 F.2d 1359, 1360 (9th Cir.), *cert. denied,* 439 U.S. 842, 99 S.Ct. 133, 58 L.Ed.2d 140 (1978). Nevertheless:

On occasion, and in widely-varying factual contexts, federal courts have dismissed indictments because of the way in which the prosecution sought and secured the charges from the grand jury.... These dismissals have been based either on constitutional grounds or on the court's inherent supervisory powers.... Whatever the basis of the dismissal, however, the courts' goal has been the same, 'to protect the integrity of the judicial process,' ... particularly the functions of the grand jury, from unfair or improper prosecutorial conduct. (citations and footnotes omitted.)

607 F.2d at 881 quoting *United States v. Chanen,* 549 F.2d 1306, 1309 (9th Cir.) *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977).

From the inception of the twenty-month grand jury investigation when the prosecutors divined the office of "agent of the grand jury" on the IRS agents through the time of the agent's improper "summaries" presented shortly before the indictment was returned, the conduct of the Department of Justice attorneys substantially undermined the ability of the grand jury to exercise independence. The numerous abuses and violations of rules and constitutional principles must be considered particularly serious because of the admissions in these hearings that, for the most part, the activity was undertaken knowingly and purposefully.

In addition to the abuses detailed in this memorandum opinion numerous other instances of misconduct are recounted by Judge Winner in his August 25, 1983 Opinion. In sum, the substantial departures of prosecutors in this case from established notions of fairness, from clearly articulated rules of law, from specific rules of procedure and, indeed from the Department of Justice's own manual and operating directives constitute systematic and pervasive overreaching. There is no doubt that the indicting grand jury was usurped and that time-honored constitutional principles were sullied.

Some of the violations, standing alone, require dismissal. Others, while not singularly requiring dismissal, when combined with one another amount to travesty. What is perhaps most alarming is that even

---

**26.** In almost seven years on this bench this case and *United States v. Anderson, supra,* are the only two instances of many cases in which I have felt constrained to dismiss an indictment.

in the very last of so many hearings, one of the prosecuting attorneys continued to refer to the challenge to his and his colleagues' conduct as "silly" and "frivolous." K. Tr. 1137. The supervisory authority of the court must be used in circumstances such as those presented in this case to declare with unmistakable intention that such conduct is neither "silly" nor "frivolous" and that it will not be tolerated.

The government attorneys, who replaced the prosecutors whose activities are at issue, reluctantly acknowledge that with regard to *at least* two of the procedures employed in this investigation they were "technically inaccurate" and "should obviously not be repeated in the future." *See* Government Response to Defendants' Opening Brief in Support of Motions to Dismiss the Indictment, filed November 14, 1983, at pp. 11, 15. When all the "technically inaccurate" procedures and abuses which "should obviously not occur in the future" are accumulated, what emerges is a picture of an IRS investigation out of control and a grand jury which was converted into little more than a rubber stamp.

The Fifth Amendment guarantees that no person shall be held to answer for an infamous crime "unless on a presentment or indictment of a grand jury." The Supreme Court observed in *United States v. Dionisio*, 410 U.S. 1, 16–17, 93 S.Ct. 764, 772–773, 35 L.Ed.2d 67 (1973) that "[t]his constitutional guarantee presupposes an investigative body 'acting independently of either prosecuting attorney or judge,' *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252, whose mission is to clear the innocent, no less than to bring to trial those who may be guilty." As a result of the conduct of the prosecutors and their entourage of agents, the indicting grand jury was not able to undertake its essential mission. That such is a significant and prejudicial deprivation of these defendant's constitutional rights to due process of law and personal liberty should require no further recitation of authority.

## ORDER

Based on the foregoing I hold and ORDER as follows:

1. The indictment is dismissed because of the numerous violations of Rule 6(d), Fed.R.Crim.P.

2. The indictment is dismissed because of the numerous violations of Rule 6(e), Fed.R.Crim.P.

3. The indictment is not dismissed solely for the use of "pocket immunity" in contravention of 18 U.S.C. §§ 6002 and 6003.

4. The indictment is not dismissed solely for violations of the Fifth Amendment to the United States Constitution.

5. The indictment is not dismissed solely for the knowing and deliberate presentation of misinformation to the grand jury.

6. The indictment is not dismissed solely for violations of the Sixth Amendment to the United States Constitution.

7. The indictment is dismissed because of the totality of the circumstances which include numerous violations of Rule 6(d) and (e), Fed.R.Crim.P., violations of 18 U.S.C. §§ 6002 and 6003, violations of the Fifth and Sixth Amendments to the United States Constitution, knowing presentation of misinformation to the grand jury and mistreatment of witnesses.